Bernard J. Rosen/S.B. No. 41538
Beverly Hills Law Building
424 S. Beverly Drive
Beverly Hills, CA 90212
Tel:  (310) 203-9600
Fax:  (310) 203-9696
e-mail: bernardrosenlaw@aol.com

Attorney for Defendant
RUIXUE SHI

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) No. CR 20-350-RGK-01 |
|---|---|
| Plaintiff, | ) **Sentencing Memorandum on behalf of Defendant Ruixue Shi** |
| v. | ) |
| RUIXUE SHI, | ) Date of Hearing: November 21, 2022 |
|  | ) Time:            1:30 p.m. |
| Defendant. | ) |

    Defendant Ruixue Shi, by and through her attorney Bernard J. Rosen, hereby files a Sentencing Memorandum for the Court's consideration.

Dated: November 4, 2022        Respectfully submitted,
                                              /s/ Bernard J. Rosen
                                              BERNARD J. ROSEN
                                              Attorney for Defendant
                                              RUIXUE SHI

SENTENCING MEMORANDUM

<u>Introduction</u>:

Defendant Ruixue Shi is before the Court for sentencing having pled guilty pursuant to a plea agreement with the government [PA, doc. 101] to count 2 of the Indictment charging her with wire fraud in violation of 18 U.S.C. § 1343.

<u>Guidelines Considerations</u>

The parties did not enter into an agreement concerning the Sentencing Guidelines factors applicable to her case. (PA, ¶ 12.) The Probation Officer has concluded in the Presentence Report (PSR) that an offense level of 35 is applicable which reduces to a total offense level of 32 following application of the 3-level downward adjustment for acceptance or responsibility. (PSR, ¶¶ 70-74.) The Probation Officer has also determined that the defendant has zero criminal history points, thus establishing a criminal history category of I. (*Id*., ¶¶ 76-80.)

The defendant does have disagreements with other factors used by the Probation Officer in calculating her offense level. These will be discussed below.

<u>Defendant's Disagreements with the Probation Officer's</u>

<u>Guidelines Offense Calculations</u>

Defendant's first issue is with a misstatement in the Presentence Report rather than a miscalculation. In both paragraphs 5 and 27 of the Report the Probation Officer has stated that the parties "believe" (¶ 5), or "agree" (¶ 27), that the loss amount and, thus, the restitution owed, is approximately $22,833,441. That isn't correct.

The plea agreement states that it is the government's belief that the restitution owed, thus the loss amount, is $22,833,441. (PA, ¶ 6.) All that the agreement states about the defense position is that the defendant reserves the right to contest the exact amount. (*Ibid*.) As discussed in more detail, below, it is the

defendant's belief that the loss amount, and the restitution owed, is less than $22,833,441, much less.

Two possible examples leading to an overstatement of loss by the Probation Officer appear in the complaint (doc. 1) filed prior to the return of the Indictment. The FBI special agent submitting the affidavit upon which it was issued acknowledges that defendant Shi "provided partial refunds to certain victims …" (*id.*, ¶ 18, at p. 10) and that some "non-victim funds" were deposited into the bank accounts into which the victims' funds were deposited. (*Id.*, ¶20, at p. 13.)

Concerning the refunds, Application Note 3(E) to U.S.S.G. § 2B1.1(b)(1) provides that "loss" shall be reduced by, amongst other things, "the money returned …." Moreover, though the agent expressed the belief that the "non-victim funds" deposited into the same accounts as the victims' funds were "minimal," they are, nevertheless, also not part of their loss. Given the absence of any acknowledgement of either of these non-loss amounts in the presentence report it is quite possible, it is submitted, that the loss amount accepted by the Probation Officer and the 20-point addition to the Guidelines offense level attributable to that loss amount (PSR ¶ 52) has been overstated.

It is the government's burden to demonstrate the amount of loss suffered by the victims and to do so by a preponderance of the evidence. (18 U.S.C. § 3664(e).) Given the importance of that amount in determining the Guidelines offense level, that demonstration ought to include, it is submitted, more than simply someone's estimates of the amounts "returned" and/or the amounts of the "non-victim funds" deposited into the accounts used. As importantly, if not more so, that demonstration needs to include an explanation as to how those amounts were determined. As will be shown, no such explanation appears to have been given.

The Probation Officer has reported, for instance, that the amount of loss the government believes was sustained by the victims – $22,833,441 – "was

determined by the government from completing *a thorough analysis*, of Shi's bank accounts." (PSR, ¶ 52; emphasis added.) In fact, however, the analysis actually done, as reflected in the declaration of the FBI's forensic accountant, dated August 11, 2022 (attached as exhibit A), appears to be anything but "thorough."

The declaration lists 28 bank accounts that he "analyze[d]" on which defendant Shi was a signatory. (Ex. A, ¶ 2.) He "identified and aggregated incoming deposits" into those accounts, the declaration explains, against which he then "credited" debits from those accounts to individuals he determined had made the deposits. (*Id.*, ¶ 3.) The result, he declares, totaled the amount the governments argues was the total loss to victims of this fraud, the amount of $22,833,441.50.

There are several problems, however, with the method of analysis described in that declaration. The first is omitting, as omitted from the presentence report, any acknowledgement of what the government's investigative agent conceded in the underlying complaint, that some "partial refunds" were made, and that, even if "minimal," some "non-victim funds" were deposited in some of those accounts. As argued, above, these are not part of the "losses" suffered in this case.[1]

A lesser problem, perhaps, but a problem nevertheless, concerns the forensic accountant's determination of signatories. The defendant was "a"

---

[1] Defendant Shi's prior counsel obtained the services of a forensic accountant as well and he has concluded, based on the identification by defendant Shi of refunds paid but not identified in the government's analysis of the accounts, of amounts deposited from her own funds, and of amounts relating to other projects, that the loss amount is closer to $7,000,000 than $22,000,000 – an amount still warranting an 18 level increase in the Guidelines calculations. (A 2-page summary of the defense accountant's conclusions is attached as exhibit B.)

Concededly, her identifications are self-serving at least as far as the amounts are concerned – an issue the parties agreed the defendant reserved the right to contest (PA, ¶ 6) – but that partial refunds were made and that non-victim funds were deposited is acknowledged in the complaint filed with the Court. (Doc. 1.) So what is to be made of the government's position regarding loss – when their analysis makes no mention, at all, of these amounts?

signatory, he declares. (*Id*., ¶ 2.) But were there others – or was defendant Shi the only signatory?

More importantly, was any effort made to determine whether or not defendant Shi's signature might have been forged on any checks or other documents authorizing withdrawals from or transfers of funds out of any of these accounts. As explained, below, that appears to be a very real possibility.

And there remain other questions: were debits or withdrawals made to persons or business entities other than the individuals the accountant determined had made deposits into those accounts? If so, to whom – and more importantly, if so, was any effort made to "analyze" the purpose of these debits or withdrawals? – another issue discussed further, below.

But the most important question arising from that declaration appears when one looks at the accounts listed as having been "analyzed." The plea agreement, for instance, has the parties agreeing that the fraudulent scheme "devised" was in a "hotel and condominium complex called *the Hyde Resorts and Residences Coachella Valley* …." (PA, ¶ 11.) The declaration (ex. A), however, lists at least eight accounts seemingly having nothing to do with "Hyde" and/or the "Coachella Valley Resort" development. The declaration cites two accounts in the name of FHB Golden Oaklein LLC (*id*., ¶¶ 2.a, w), five accounts in the name of GHB Don Juan Villas LLC (*id*., ¶¶ 2.c, r, and x-z), and one other account in the name of Be Home US Corporation. (*Id*., ¶ 2.aa.)[2] How has it been determined – <u>if</u> it has been determined – that these represent victims' losses in the fraudulent scheme alleged and admitted to, in this case?[3]

---

[2]  Two other accounts listed are in the name of GHB Development LLC. (Ex. A, ¶¶ 2. b and t.)

[3]  The parties have agreed that the Court may order the payment of restitution "to persons other than the victims of the offense to which defendant is pleading guilty …" (PA, ¶ 6) as provided for by 18 U.S.C. § 3663(a)(1)(A). "Loss," for determining the Guidelines offense level, however, is "specific" to the offense committed (U.S.S.G. § 2B1.1(b)), including that relevant to "commission of the offense <u>of conviction</u>." (*Id*., § 1B1.3(a)(1); emphasis added.)

5

The amount of loss is not the only issue defendant's counsel has with the Probation Officer's calculations and conclusions regarding defendant Shi's offense level as determined under the Sentencing Guidelines. As also discussed, below, the defendant believes that the Probation Officer has not sufficiently assessed the positions of the victims of this case when considering both the "substantiality" of any financial hardship any may have suffered (PSR, ¶¶ 53-61) as well as their "vulnerability." (*Id*., ¶¶ 65-67.)

A "Reasonable" Sentence for Defendant Shi

As the Supreme Court explained in *Gall v. United States*, 552 U.S. 38, 46 (2007), the Guidelines now are simply "advisory." The Court must still calculate the applicable Guideline's range but that is only "the starting point" of sentencing proceedings, it is no longer the bottom line. (*Id*., at 49.) Indeed, the Court went on in *Gall* to state that in determining an appropriate sentence to impose on a defendant a court "*may not* presume that the Guidelines range is reasonable. … He must make an individualized assessment based on the facts presented." (*Id*., at 50; emphasis added.)

The Court has since gone on to emphasize the importance of having the totality of those facts "presented." In *Pepper v. United States*, 562 U.S. 476 (2011) the Court reiterated the principles that "the punishment should fit the offender and not merely the crime" and that in determining an appropriate sentence "justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender."[4] (*Id*., at 487-488; internal citations omitted.)

These principles are being cited, in part, because defendant's counsel believes that the documents currently before the Court – the Indictment, the plea

---

[4] And, the Court observed (*id*., at 488-489), Congress has similarly honored those principles in providing that "no limitation" be placed on the information a sentencing court may receive in determining an appropriate sentence. (18 U.S.C, § 3661.)

6

agreement, and even the Presentence Report – do not provide the Court with <u>all</u> of the facts it needs to consider, particularly information concerning the "circumstances of the offense," in order for it to impose a sentence that is reasonable, just, and fits defendant Shi – not merely the crimes she has admitted committing.

The parties have agreed that each is "free to: (a) supplement the facts by supplying relevant information to … the Court" and to do so "even if that factual information may be viewed as inconsistent with the facts agreed to in th[e] agreement …." (PA, ¶ 25.) As shown below, there are a great number of facts the Court needs to be advised of in determining a 'reasonable' sentence to impose on defendant Shi.

Some of the 'Circumstances of the Offense' Committed

The fact basis agreed to by the parties in the plea agreement states, amongst other things, that in "carry[ing] out her fraudulent scheme" defendant Shi "contacted representatives of Dakota Development, a real estate development subsidiary of the Los Angeles lifestyle hospitality company SBE Entertainment … about using SBE's 'Hyde' brand, which was a luxury hotel and nightlife brand owned by SBE [and that] [t]hrough these discussions defendant reached an agreement with Dakota Development that the … development would be developed under SBE's brand name 'Hyde.'" (*Id*., ¶ 11, at 8-9; see, also, PSR, ¶ 16.)

"[T]ak[ing] into account the circumstances of the offense" committed (*Pepper, supra*) should include, it is submitted, some consideration concerning Dakota Development and SBE Entertainment.

Counsel has attached as exhibits C and D, respectively, what he has found concerning those companies by simply "googling" them on the internet. Granted the documents contain a lot of self-laudatory comment, nevertheless, even after discounting much of that information, one has to acknowledge that these are

legitimate businesses of long-standing, whose primary function appears to be developing grand-scale real estate developments. Is it not reasonable to assume that although, perhaps, not all of their developments have been a rousing success, they are, nevertheless, sufficiently experienced and knowledgeable to recognize what amounts to a Ponzi-type fraudulent scheme when their involvement in such a scheme is being solicited?

The point counsel is trying to make is that while defendant Shi has admitted, and continues to admit, the eventual and intentional transformation of her investment plans into fraudulent ones, it appears that, initially at least, her intent to develop a successful real estate complex in the Coachella Valley (*cf.*, PA, ¶ 11, at 8) seemed reasonable and doable to those legitimately in the business of creating such complexes. This is information, it is submitted, that the Court may consider regarding both "the circumstances of the offense … [and] the character and propensities of the offender." (*Pepper, supra*.)

Nor is this the only such example. The parties have agreed in the plea agreement that, amongst other things, defendant Shi "identified approximately 47 acres of land in Coachella … to build the Hyde Development." (PA, ¶ 11, at 9:12-2; see also, PSR, ¶ 16.) Indeed, she did.

Left out of the plea agreement, however, as well as the presentence report, is the fact, "duly sworn" to by the FBI special agent signing the affidavit upon which the complaint was issued, that defendant Shi had in fact purchased a "20-acre property … in Coachella"[5] (doc. 1, ¶ 17.c) and had attempted to purchase a 27-acre "adjacent property …." (*Ibid.*) Indeed, it was a City of Coachella official, its 'Development Services Director,' who is quoted as explaining that regarding

---

[5] If so, counsel submits, as he rhetorically asked, above, shouldn't the debits and withdrawals – the business checks – necessary for an escrow to both open and close purchasing that 20-acre property have been recognized and identified by the forensic accountant analyzing all of those business accounts? And if there are withdrawals appearing to relate to the purchase of that property, shouldn't the value of that property – whenever or however determined – lessen the dollar amount of the loss he calculated? (*Cf.*, app. note 3(E)(ii) to Guidelines § 2B1.1.)

that adjacent property, defendant Shi was "unable to close escrow on" it (*ibid.*), though he appeared to remain hopeful that it would "close escrow soon and that the project [would] proceed in getting its development approvals …." (*Id.*, ¶ 17.d.)

Why defendant Shi was "unable" to close escrow on that property is not explained, though, as discussed, below, there is some information suggesting why. More importantly, it is submitted, being "unable to close" an escrow certainly suggests that an escrow to purchase that property had at least been "opened"[6] – another "circumstance" of the offense to be considered on her behalf. (*Pepper, supra.*)

And similarly to the rhetorical questions asked, above, about the agents of Dakota Development and SBE Entertainment, what about the City of Coachella officials – not only the director of Development Services but, also, the city's other representatives? Were they so easily duped? – or did defendant Shi, at least initially, have what seemed like a workable plan to them as well?

And that question is not asked entirely rhetorically, either. The complaint's affiant established that both the Coachella City Manager and its Economic Development Manager accompanied defendant Shi to China to participate in one of her "sales presentation[s]," as well as a representative from Dakota Development.[7] (Doc. 1, ¶ 14.)

There are, moreover, other sources of information concerning defendant's scheme from which the Court may find information relevant to its consideration of an appropriate and reasonable sentence to impose on her.

---

[6] With, perhaps, a debit or withdrawal made from one of those business accounts as a security deposit upon such an opening. (See, fn. 5.)

[7] One of the 'victim impact' letters submitted to the Court by the government includes photos from one of these presentations identifying several of the American business and political individuals present.

As one might expect there have been several civil lawsuits filed over the failure of this development – one, in fact, filed in this Court, the United States District Court for the Central District of California – Eastern Division: *Hyde Morgan Development LLC. v. Anthony Demasi, et al.* [*Hyde*], no. 2:16-cv-07931-ODW.

The complaint filed (*Hyde*, doc. 1) alleged, amongst other things, that Hyde was a real estate developer developing a real estate project in the City of Coachella (*id.*, ¶ 11) and that it was "catering to foreign purchasers who were interested in purchasing real estate through HYDE's real estate projects." (*Ibid.*) "Hyde's manager" for that project, the complaint alleged, was "Ruixue Shi."[8] (*Ibid.*)

The complaint then went on to allege certain fraudulent activities by two gentlemen whose names, at this point in time, at least, may be unknown to the Court – but who are going to be shown to have been very implicated in what defendant Shi has admitted committing. These allegations provide more "circumstances of the offense" (*Pepper, supra*) the Court needs to consider in determining what would be a "reasonable" sentence to impose on defendant Shi.

The complaint alleges that the lead defendant, Anthony Demasi, was introduced to Shi in her role as Hyde's manager for the project by James Clark, an individual allegedly consulting with Hyde over the project. Clark allegedly introduced Demasi to Shi as a licensed Michigan attorney and, allegedly, "[i]n order to convince Shi to retain his services, Demasi fabricated a certificate of good standing allegedly issued from the State Bar of Michigan." (*Hyde*, doc. 1, ¶ 11.)

But, the complaint continues, Demasi was a disbarred attorney from Illinois, disbarred after being convicted, in a federal court, of involvement in a Ponzi fraud

---

[8] Counsel requests that the Court take judicial notice of the allegations contained therein pursuant to FRE 201(b)(2), (c)(2).

scheme. (*Ibid.*) Demasi denied being a convicted felon, according to the complaint, and Clark "vouched" for him and recommended that Demasi serve as an 'escrow agent' for Hyde, responsible for receiving international wires from real estate purchasers and then transferring the funds to Hyde for development of the projects. (*Ibid.*)

So far, of course, these are simply allegations in a lawsuit that was eventually dismissed. (*Hyde*, doc. 24.) But the reason for the dismissal provides the Court with a great deal of information about "the circumstances of the offense" (*Pepper, supra*) committed, here, by defendant Shi.

The dismissal was without prejudice (*Hyde.*, doc. 24) and made upon a motion filed on the plaintiff's behalf advising District Judge Wright that "[t]he parties have … reached a full settlement [t]he term of which requires that this matter be dismissed without prejudice." (*Hyde*, doc. 22.) The settlement, Judge Wright was advised, was "based entirely on non-monetary consideration," that is, "cooperation by defendants in investigating the loss …." (*Ibid.*)

That co-operation agreement was not itself filed but counsel has been provided a copy by defendant Shi's former counsel and it is attached hereto as exhibit E.[9] As one can see, the primary agreement is that defendant Demasi will co-operate with the plaintiffs in producing evidence of James Clark's "malfeasance, misrepresentations, fraud, and other wrongdoing … related to his dealings with or involving HYDE … and/or Serena[10] Shi …." (Ex. E, ¶ D, at 1.)

More specifically, the plaintiffs in that law suit, and their legal representatives, were satisfied that Demasi had evidence that could prove that Clark, amongst other things, a.) "skimmed (or attempted to skim) money for [him]sel[f] … in connection with the purchase of the real property for the Hyde

---

[9]  Defendant Shi is a signatory to the agreement, and she has advised her present counsel that that is in fact her signature appearing on the last page.

[10]  Defendant Shi is sometimes known as Serena. (PSR, at 2.)

Hotel Project[11] by representing to HYDE that various terms for the purchase were different than they were" (*id.*, ¶ J, at 2) and b.) "forged documents[] … to third parties that e-mails and documents came from Shi and others at Global when they did not (*e.g.*, with the use of Chinese symbols)."[12] (*Id.*, ¶ L, at 2-3.)

The latter allegation is particularly relevant, it is submitted, because defendant Shi's prior counsel obtained the services of a forensic document examiner whose 10-page report concluded that "it is highly probable Ruixue Shi did not sign her name on the questioned documents listed as items 1 through 5." The report identified those documents as copies of two Wells Fargo Bank checks (numbers 1040 and 1058) in the account name of HYDE MORGAN and three Wells Fargo account application forms (two for business accounts, one for a consumer account.)[13]

As counsel has suggested, above, the totality of the circumstances involved in the commission of this offense make it seem highly unlikely that defendant Shi acted alone, another circumstance, it is submitted, to be considered by the Court in determining the reasonableness of a sentence to impose upon her, alone.

As also indicated, above, counsel for defendant Shi believes that the Probation Officer has not given sufficient consideration to all of the information or "circumstances" relating to the victims of defendant Shi's crimes.

The victims of her crimes are, indeed, victims – no one is doubting or questioning that fact. Victims of crimes, of course, are human. Upon realizing they have been victimized is it not reasonable to recognize that one likely reaction to their situation is anger – towards those they believe have caused their

---

[11] Previously identified as the "Hyde Coachella Valley Resort & Residence Project." (¶ I, at 2.)

[12] This agreement is the source of counsel's reference, above (at p. 5), that forgeries of her signature was a real possibility.

[13] Three pages of that report, two containing examples of the known signature of defendant Shi, the other containing the questioned exemplars, are attached hereto as exhibit F. Counsel can provide the Court with the entire report should it wish to receive it.

victimization? And if that emotional reaction is reasonable might not exaggeration – of their loss and/or circumstances – be another?

Counsel for defendant Shi is <u>not</u> questioning the fact that the victims all suffered financial loss, but he does believe that he has a duty to refer the Court to information that might reasonably support the conclusion that, if not all, then at least some of the victims who have provided victim impact statements submitted by the government have responded emotionally and, in some respects, at least, may have exaggerated that loss, at least in terms of the "substantiality" of any financial hardship they may have suffered (PSR ¶¶ 53-61), and/or their "vulnerability." (*Id*., ¶¶ 65-67.)

It is clear that the victims in this case were citizens of China – the People's Republic of China. (*Id*., ¶¶ 18, 21, 24.) Let's consider that for a moment.

Simplistically, perhaps, China is looked on, even in the present times, as a Communist country. If so, it might not be one that Karl Marx or Friedrich Engels would recognize.[14]

According to several sources found on the internet, the present population of China contains more individual billionaires than the United States.[15] The point being made, it is submitted, is that China is a country where the development and attainment of personal wealth through entrepreneurial activity – particularly investing in real estate projects, including international projects – is not only not disapproved, it appears to be encouraged.[16] And that might provide a slightly different motivation for so many of defendant Shi's victims to have become victimized – it was not so much that they had been seduced by her presentations,

---

[14] Authors of the Communist Manifesto, published in 1848.

[15] One such source is attached hereto as exhibit G.

[16] Attached as exhibit H is a copy of an article recently published in the Wall Street Journal about Chinese investment in international real estate projects, and some of the financial problems related to such activity.

as that they viewed this as an opportunity to become involved in the development of wealth, as so many of their fellow citizens seemed to be doing.

And this can be demonstrated, it is submitted, by viewing some of the victim impact statements cited by the Probation Officer. (PSR, ¶¶ 29-42.) One victim describes bank loans he obtained in an amount greater than $500,000. (*Id*., ¶ 29.) Don't Chinese banks require some security before loans in such amounts are provided? Might that have something to do with what appears to be real estate investments he had previously made in Canada? (*Ibid*.)

Another mentioned annual tuition for a daughter attending high school in the United States. (*Id*., ¶ 32.) But annual tuition "up to $600,000"? (*Ibid*.) Yet also apparently able to obtain a bank loan in that amount to pay that amount of tuition? (*Ibid*.)

A third mentioned that the loss suffered – also in the amount of half a million dollars – constituted half of her family's "investing fund." (*Id*., ¶ 42.) Might that have been an amount the family had saved, or earned, in excess of the family's living expenses?

These observations are not intended to deny that the victims are, indeed, victims, nor that they suffered the losses they did suffer! These observations are, however, a part of the "circumstances of the offense" committed by defendant Shi – circumstances the Court might want to consider in determining the 'reasonableness' of the sentence it will impose on her.

<u>A Reasonable Sentence for Defendant Ruixue Shi</u>

Defendant Shi has no history of prior criminal behavior. (PSR, ¶¶ 76-81.) Moreover, as the parties have agreed in the plea agreement, it is "practically inevitable and a virtual certainty" that she is going to be deported as a result of this conviction. (*Id*., ¶ 10.) Upon being deported to China, of course, the victims will then be able to seek whatever relief they may through the Chinese judicial system – a process likely to be delayed, however, should the Court impose a

lengthy term of imprisonment upon defendant Shi by the likelihood that a "final order of removal" will leave her unable to seek the extended time credits allowed by the First Step Act. (18 U.S.C. § 3632(d)(4)(E)(i).)

By the time of her sentencing, defendant Shi will have been detained in custody for more than 27 months. (PSR, p. 1.) Her counsel may not ask for a term of imprisonment of less than 24 months. (PA, ¶ 2.h.) He may, and does, contend, however, that a term of imprisonment of 27 months is a "reasonable" sentence (see *Gall, supra*,) when considering both "the circumstances of the offense together with the character and propensities of the offender." (*Pepper, supra.*) And when considering those circumstances and character, it is also a sentence "not greater than necessary" to satisfy the purposes of sentencing expressed in 18 U.S.C. § 3553.

## Conclusion

For all of the reasons expressed, above, the Court should consider imposing a term of imprisonment upon defendant Shi of 27 months.

Respectfully submitted,
/s/ Bernard J. Rosen
BERNARD J. ROSEN
Attorney for Defendant
RUIXUE SHI