E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-1259
    Facsimile: (213) 894-0141
    E-mail:   alexander.schwab@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-350-RGK |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT RUIXUE SHI; DECLARATIONS; EXHIBITS |
| v. | |
| RUIXUE SHI aka "Serena Shi," | Hearing Date: November 21, 2022 Hearing Time: 1:30 p.m. Location:   Courtroom of the Hon. R. Gary Klausner |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Alexander B. Schwab, hereby files its sentencing position for defendant Ruixue "Serena" Shi.

    This sentencing position is based upon the attached memorandum of points and authorities, the declarations of Alexander B. Schwab, Travis Bouchard, and Mei XUan, the exhibits filed separately under seal, the presentence investigation report ("PSR"), the files and

records in this case, and such further evidence and argument as the Court may permit.

Dated: November 7, 2022                     Respectfully submitted,

                                            E. MARTIN ESTRADA
                                            United States Attorney

                                            SCOTT M. GARRINGER
                                            Assistant United States Attorney
                                            Chief, Criminal Division


                                                    /s/
                                            _____
                                            ALEXANDER B. SCHWAB
                                            Assistant United States Attorney

                                            Attorneys for Plaintiff
                                            UNITED STATES OF AMERICA

# TABLE OF CONTENTS

PAGE(S)

TABLE OF AUTHORITIES ..............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION.................................................1

II.   STATEMENT OF FACTS..........................................2

      A.    Offense Conduct.......................................2

      B.    Post-Arrest Conduct...................................3

III.  SENTENCING GUIDELINES.......................................4

      A.    Loss Amount...........................................5

      B.    Substantial Financial Hardship to 25 or More Victims......6

      C.    Obstructive Conduct..................................11

IV.   ARGUMENT...................................................11

      A.    The Heartlessness of Defendant's Crime Is a Reflection
            of Its Seriousness...................................12

      B.    The Calculated Nature of Defendant's Scheme Further
            Demonstrates Her Danger to Society and the Need for a
            Substantial Term of Imprisonment.....................14

      C.    Both Defendant's Fraud Scheme and Her Conduct on Bond
            Show the Need for a 188-Month Sentence to Promote
            Respect for the Law and Afford Adequate Deterrence......15

V.    RESTITUTION................................................16

VI.   CONCLUSION.................................................17

## TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE(S)**

United States v. George,
  949 F.3d 1181 (9th Cir. 2020) ................................. 10

**STATUTES**

18 U.S.C. § 3553 ......................................... 11, 15, 16

18 U.S.C. § 3663A ............................................ 17

**SENTENCING GUIDELINES**

USSG § 2B1.1............................................. passim

USSG § 3A1.1.............................................. 4

USSG § 3C1.1. ........................................ 11, 15

USSG § 3E1.1 ............................................. 4

1                    **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.    INTRODUCTION**

3        Largely targeting her fellow Chinese nationals, defendant Ruixue

4  "Serena" Shi preyed on her victims' hopes for a better life.  She

5  claimed their investments would fund a real estate development in the

6  Coachella Valley, providing investors with financial security and

7  even a shot at a visa to the United States.  She exploited her

8  victims' ignorance of English and trust in the soundness of the

9  American economy.  And while her victims suffered financial ruin and

10  psychological torment, defendant was living large off their

11  investments, spending $2.2 million in victim funds at a company

12  specializing in luxury travel and concierge services and another

13  $800,000 at a Beverly Hills styling agency.  Even after her arrest,

14  defendant flouted her bond conditions and used her iPhone to research

15  how to flee the United States.

16        Defendant's fraud caused tens of millions in losses, but the

17  human cost to her hundreds of victims is immeasurable.  Defendant

18  didn't just steal her victims' money; she robbed them of their trust,

19  their dignity, and in many cases, their physical and mental health.

20  Dozens lost their life savings to defendant's greed, depriving them

21  of their ability to retire, fund their children's education, or

22  obtain necessary medical care.  Many descended into depression or had

23  their personal relationships shattered.  One victim reports even

24  contemplating suicide.

25        The brazenness of defendant's conduct is surpassed only by its

26  heartlessness, and only a substantial term of imprisonment will

27  appropriately satisfy the statutory goals of sentencing.  The

28  government therefore requests that the Court impose a 188-month term

of imprisonment, $26,185,634 in restitution, three years of supervised release, and a $100 special assessment.

**II.   STATEMENT OF FACTS**

    **A.   Offense Conduct**

    As part of her factual basis to her plea agreement and change of plea, defendant admitted to the following facts:

> Defendant was, at all relevant times, the General Manager of Global House Buyer LLC ("GHB"), a real estate development company based in the People's Republic of China ("PRC") that had an office in Los Angeles, California. Between November 2015 and July 2018, in Los Angeles County, within the Central District of California, defendant, knowingly and with intent to defraud, devised and executed a scheme to defraud investors (the "victims") in a GHB hotel and condominium complex called the Hyde Resorts and Residences Coachella Valley (the "Hyde Development") as to material matters, and to obtain the victims' money, by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts. Defendant carried out her fraudulent scheme, in substance, as follows:

> Defendant identified approximately 47 acres of land in Coachella, California, to build the Hyde Development. Defendant contacted representatives of Dakota Development, a real estate development subsidiary of the Los Angeles-based lifestyle hospitality company SBE Entertainment ("SBE"), about using SBE's "Hyde" brand, which was a luxury hotel and nightlife brand owned by SBE. Through these discussions, defendant reached an agreement with Dakota Development that the Hyde Development would be developed under SBE's brand name "Hyde."

> Defendant then solicited investments in the Hyde Development from prospective investors, the majority of whom were Chinese, by giving sales presentations at hotels, and contacting victims over forums on WeChat, a Chinese multi-purpose messaging, social media, and mobile payment application. In connection with the Hyde Development, approximately $22,833,441 was transferred from bank accounts in China to bank accounts controlled by defendant.

> To induce the victims to invest in the Hyde Development, defendant made false and fraudulent statements to the victims, which defendant knew were false when she made them. For example, defendant told the victims that their money would only be used to fund, and as an investment in, the Hyde Development, even though defendant intended to use funds invested by the victims on her own

2

personal expenses.  Relatedly, defendant omitted and
concealed from the victims the material fact that defendant
planned to spend a portion of the victims' funds to fund
her own lifestyle and pay for personal expenses instead of
investing the funds into the Hyde Development.

After defendant made these false statements and
material omissions, the victims wired defendant large sums
of money, primarily from the PRC.  For example, on October
27, 2016, defendant caused the transmission by victim
Y.J.R., by means of wire and radio communication in foreign
commerce, of a wire transfer of $50,000 from a bank account
in the PRC to a Wells Fargo account in Los Angeles,
California, in the name of Coachella Valley Hotel LLC
ending in 2940.

After she received the victims' funds in these Wells
Fargo accounts that she controlled, defendant used some of
the funds from victims on personal expenses rather than as
an investment in the Hyde Development.  For example,
defendant spent almost $300,000 in victim funds to purchase
two luxury cars; she spent approximately $2.2 million in
victim funds at a company that provided luxury travel and
concierge services; she spent almost $800,000 in victim
funds at a full-service styling agency in Beverly Hills,
California; and she spent hundreds of thousands of dollars
in victim funds on high-end clothing designers,
restaurants, and other stores.

(Plea Agreement ¶ 11, at 8-10).

## B.   Post-Arrest Conduct

Defendant was arrested on a complaint on June 19, 2020, and

released on a $50,000 bond.  (PSR ¶ 8, at 5).  As part of her

conditions, she was prohibited from possessing any digital device

that included ephemeral messaging applications like WeChat, where

messages are not saved.  (PSR ¶ 9, at 5).  Defendant's pretrial

officer conducted a search of her residence on August 4, 2020, to

ensure compliance.  It is a good thing she did.  Notwithstanding

defendant's promise, as part of her bond conditions, not to possess

unauthorized digital devices, she was found in possession of an

iPhone with WeChat installed.  (PSR ¶ 11, at 6).

3

Even worse, a review of defendant's recent Safari searches included the following: "how to get to Mexican visa on Taiwan passport," "How to apply for a Mexican visa for Taiwan," "Go to Mexico with a U.S. visa," "Taiwan passport to enter Mexico," "Tijuana to Mexico City," and "Tijuana to Madrid."  (PSR ¶ 11, at 6). Clearly, defendant, a national of the People's Republic of China, was exploring her options for fleeing the United States and depriving her victims of justice and a shot at restitution.  The Court issued a bench warrant and, since August 13, 2020, defendant has been in custody.  (PSR ¶ 12, at 6).

## III.  SENTENCING GUIDELINES

The PSR calculates defendant's sentencing guidelines as follows:

| | | |
|---|---|---|
| Base Offense Level: | 7 | [USSG § 2B1.1(a)(1)] |
| Loss > $9.5 million | +20 | [USSG § 2B1.1(b)(1)(K)] |
| Substantial Financial Hardship to Five or More Victims | +4 | [USSG § 2B1.1(b)(2)(B)] |
| Scheme Outside United States | +2 | [USSG § 2B1.1(b)(10)(B)] |
| Vulnerable Victims | +2 | [USSG § 3A1.1(b)(1)] |
| Acceptance of Responsibility | -3 | [USSG § 3E1.1] |
| **TOTAL** | **32** | |

The result under this calculation would be a guideline range of 121 to 151 months' imprisonment.

The government agrees with this calculation with two exceptions: First, as set forth in section III.A below, the evidence demonstrates that defendant caused losses exceeding $25 million based on information provided by investors whose losses were not documented in defendant's U.S. bank accounts.  Second, given the information contained in additional victim impact statements received after

4

preparation of the PSR, defendant should receive a six-level

adjustment under USSG § 2B1.1(b)(2)(C) for causing substantial

hardship to 25 or more victims rather than the four-level adjustment

under USSG § 2B1.1(b)(2)(B) for causing substantial hardship to five

or more victims.  The result would be a total offense level of 36 and

a guideline range of **188 to 235 months' imprisonment.**  The government

recommends a 188-month sentence -- the low end of this range.

### A.   Loss Amount

As articulated in the declaration of FBI Forensic Accountant

Travis Bouchard, Exhibit A reflects an analysis of records from

various bank accounts for which defendant was a signatory.  Forensic

Accountant Bouchard "identified and aggregated incoming deposits for

the underlying accounts from individuals" and "then credited against

those deposits any outgoing debits from the various bank accounts to

those individuals."  (Bouchard Decl. ¶ 3, at 4).  The result is

$22,833.441.50 in net incoming funds.[1]

Forensic Accountant Bouchard's analysis has its limits, however.

It does not, for example, include in its loss calculation any

investments from victims who provided funds to a different bank

account, such as one based in China.  In this regard, additional

information has been provided to the government by attorneys from

DeHeng Law, who represent a putative class of victims based in China

seeking to bring suit against defendant in the United States.  To

date, DeHeng has been in contact with 68 investors scammed by

---

[1] Defendant's sentencing position includes an unsigned "initial summary of work performed" that purports to reduce this loss figure, without supporting data, based on unsubstantiated "Refunds Paid Through Chinese Bank" and "Refunds Per Ms. Shi."  (Def.'s Sent. Memo., Exh. B, at 2).  By now it should be clear what the value is of the information defendant supplies.

defendant who have, collectively, been defrauded out of approximately $17.6 million.  (Xuan Decl. ¶ 7, at 5; Exh. D).  More specifically, attorney Mei Xuan, who is fluent in Mandarin, has received records from various investors documenting the amounts of their investments, whether in U.S. dollars or Chinese Yuan.  These records are included in Exhibit C and summarized, in English, in the chart set forth in her declaration.  As set forth in the chart, the documentation for these twelve investors demonstrates losses of $3,352,193 (including both U.S. dollar investments and a conversion of losses in Chinese Yuan into dollars).  (Xuan Decl. ¶ 6, 3-5).  Indeed, DeHeng estimates that defendant scammed at least 168 victims, causing total financial losses of more than $40 million.  (Id. ¶ 8, at 5).

Thus, even under the most conservative estimate of the losses defendant caused -- the $22.8 million identified by Forensic Accountant Bouchard and the $3.4 million for additional investors whose investments are documented in Exhibit C -- defendant is safely over the $25 million threshold, which results in a 22-level increase under USSG § 2B1.1(b)(1)(L).

**B.   Substantial Financial Hardship to 25 or More Victims**

In this case, the government has received and filed under seal 28 statements it has received from victims of defendant's fraud scheme, only seven of which were available at the time Probation prepared the PSR.  Of these, 23 explicate the devastating financial hardship defendant's fraud caused them individually.[2]

---

[2] One victim impact statement contains the experiences of two different victims.

1. A.Z. describes how defendant shattered his family: "My family and I have lost our residence and savings and also incurred $200,000 in debt."  (Exh. B, at 1).

2. C.S. agreed to invest with defendant by making "five installments of about $160,025.00."  As "an ordinary working class person," this sum proved to be C.S.'s financial undoing, with his finances falling "into a desperate situation" and insufficient funds to pay his mortgages.  (Exh. B, at 79).

3. After losing $143,100 to defendant's scheme, G.X.'s "spouse fell ill and had to rest and recover at home for three months.  We were unable to carry out social interactions or work normally." (Exh. B, at 15).

4. The funds D.F. invested in defendant's scheme were beyond his own savings, requiring him to take out loans he now cannot repay. He describes how "[f]our years of debt collection life has turned me from black hair to white hair.  (Exh. B, at 87).

5. H.W.-1 states that defendant "defraud[ed] our family, making our family's desire to immigrate to the U.S. impossible." (Exh. B, at 18).

6. H.W.-2 reports losing $400,000 in investment principal -- "almost 50% of our investing fund."  (Exh. B, at 89).

7. H.T. describes how "all the savings of my family was invested into [defendant's] hotel project, it's all the savings of my family . . . . all my family members have to rent a house and pay rent[] every month, because there's no more savings for my family to buy new house any more."  (Exh. B, at 19).

8. J.D. borrowed $186,000 from "parents, friends, and relatives" to make the down payment on the investment defendant

solicited.  The resulting financial losses caused J.D.'s daughter to cease her education in the United States and return to China and even caused a rift with J.D.'s parents, who "moved away from the home we had lived [in] together for 20 years."  (Exh. B, at 25).

9.   J.H., a "divorced single mother who has a minor child to support," needed to take out a high-interest loan in connection with her investment in defendant's fraudulent scheme.  J.H. reports that she is now unable to repay that loan.  (Exh. B, at 20-21).

10.   L.D. invested $200,000 with defendant, which represented "the savings of my entire family."  (Exh. B, at 47).

11.   L.M. "painfully decided to sell a residence" to invest in defendant's scheme, only to lose her savings and find Global House Buyer's offices in China to be "completely empty."  (Exh. B, at 36).

12.   L.N. states that his investment in defendant's fraud "consisted of hard earned savings contributed by several families, and the expenses for [my son] to study abroad were also borrowed from relatives and friends.  If the money just disappeared like this, there will be no way for me to pay it all back in this lifetime!" (Exh. B, at 40-41).

13.   L.S.'s letter chronicles her family's suffering at defendant's hands: "Due to the terrible impact of [defendant]'s fraud on our small company, we had to close it under financial pressures. After closing the company, we had no income and also sold our residence to repay loans."  (Exh. B, at 32).

14.   M.L. describes how defendant "cheated me out of all my savings."  (Exh. B, at 92).

15.   Q.D. explains that defendant's scheme cost him his "entire investment fund," which was intended to "provide security during my senior years later."  (Exh. B, at 84).

16.   X.H. paid $532,000 for two suites in defendant's fictious real estate development -- a sum of money that comprised "all the assets owned by my household and additional borrowings."  X.H. describes his "whole family" as being "on the verge of collapse," as he and his wife "constantly struggle to make ends meet" amidst experiencing signs of depression.  (Exh. B, at 55).

17.   X.Y. explains how "I invested in this project with all of my life savings.  I hadn't expected that I would not only lose the security during my senior years, but also lose all my savings for that purpose to fraud, with no money left."  (Exh. B, at 84).

18.   Y.C. invested RMB 1,206,000, the equivalent of $180,539 and Y.C.'s "entire family's savings accumulated over more than 20 years," in defendant's fraudulent business.  (Exh. B, at 61).

19.   In a letter combining statements of two victims, Y.L. reports that defendant's fraud "caused me to lose my entire savings. In order to make a living, my husband works three thousand kilometers away from our home; my child cannot afford to study in a good school; and I dared not to ask for a sick leave despite my illness.  There was no more joy in our life, but more hardship."  Victim C.Z. similarly explains that defendant "deceived and deprived me of my entire savings for my retirement."  (Exh. B, at 7).

20.   Y.Z. describes how "[h]alf of the funds I invested came from my parents, aged 76 and 71," which caused the "loss of their life savings" and inability to afford necessary medical care.  (Exh. B, at 64).

21.  Z.J.'s parents invested RMB 813,500 and $729,000 in defendant's fraudulent business in the hope that the family could immigrate to the United States as a whole.  They were left with nothing.  Z.J. reports that the experienced "led to the breakdown of my parents' marriage," which in turn led to an "economic crisis" and Z.J.'s inability to continue studying in the United States.  Z.J. has since had to return to China.  (Exh. B, at 76).

22.  Z.Q., a single mother, spent almost all her savings investing $200,000 in defendant's fraudulent business.  Z.Q. wonders how she will survive on her current pension or pay for her son's education.  (Exh. B, at 70).

Several of the victim impact statements also describe how the investments reflect not only the author's own savings, but the savings of friends or family members who bundled money together for investment.  These statements therefore demonstrate substantial financial hardship to 25 or more individuals.

Even if the victim impact statements do not themselves identify at least 25 individuals who suffered substantial financial hardship, for the adjustment to apply, all that is necessary is a "reasonable estimate" where it is "sufficient for the government to produce evidence for enough of the [victims] to allow the sentencing court reasonably to infer a pattern."  United States v. George, 949 F.3d 1181, 1186 (9th Cir. 2020) (internal quotation marks omitted).  In this case, the vast majority of the 28 victim impact statements demonstrate substantial financial hardship, and these letters reflect the experience of just a fraction of defendant's victims.  Based on the pattern in the victim impact statements, the government has more than met its burden of establishing that a few additional investors

out of the hundreds remaining also suffered substantial hardship as a result of defendant's crimes.

### C.   Obstructive Conduct

Defendant's disregarded her pretrial conditions and explored how to flee the United States.  Though the government does not contend that this misconduct warrants an enhancement for obstruction of justice, the commentary to the Sentencing Guidelines counsels that "[s]ome types of conduct ordinarily do not warrant application of this adjustment but may warrant a greater sentence within the otherwise applicable guideline range."  USSG § 3C1.1, comment. (n.5). Among the examples of obstructive conduct provided are "avoiding or fleeing from arrest" and "lying to a probation or pretrial services officer about defendant's drug use while on pre-trial release," both of which are analogous to defendant's misconduct.

The government's recommended sentence of 188 months falls at the low end of her guideline range based on a total offense level of 36. Should the Court determine a lower offense level applies, however, defendant's outrageous behavior while on pretrial release would easily be a basis for still imposing a 188-month sentence, which would, for example, fall at the high end of a total offense level of 34.

## IV.   ARGUMENT

This is a case where all the sentencing factors favor a substantial term of imprisonment.  A sentence of 188 months -- the low end of defendant's guideline range -- is necessary to achieve the goals set forth in § 3553(a).

**A.   The Heartlessness of Defendant's Crime Is a Reflection of Its Seriousness**

It is simple greed that motivated defendant to take advantage of literally hundreds of victims, and greed that emboldened her to fritter away entire families' savings to fund her own lavish lifestyle.  The victims' letters chronicle the trail of devastation defendant left behind her, from homes lost to foreclosure, to children who can no longer pursue their education, to elderly parents whose medical care their children can no longer afford.  As their statements demonstrate, many of defendant's victims were working class individuals living in a country where the GDP per capita is less than a fifth what it is in the United States[3] and without the social safety net our government and nonprofit organizations provide. The more than $26 million in victim losses for which the government is seeking restitution is, if anything, an understatement of the scope of defendant's scheme; defendant operated her scam in both the United States and China, so any victim funds transferred to bank accounts outside the United States are not accounted for in the government's financial records, and documents received from civil counsel in the putative class action only capture a snapshot of investors' self-reported losses.

While Section III.B documents the substantial <u>financial</u> hardship defendant's victims suffered, their financial losses only scratch the surface of what they suffered at defendant's hands.  Even setting aside from the economic impact of defendant's fraud, few crimes compare in terms of the lasting personal damage she has left behind.

---

[3] The World Bank | Data, "GDP per capita (current US$)," https://data.worldbank.org/indicator/NY.GDP.PCAP.CD.

L.D. found herself "on the verge of mental and physical breakdowns, unable to work and live a normal life," and even reports that even her ability to breastfeed her child was affected by the psychological harm defendant inflicted. (Exh. B, at 47). Multiple victims report experiencing depression (e.g., Exh. B, at 10, 41, 55, 73, 92), premature graying (e.g., Exh. B, at 41, 87), or insomnia (e.g., Exh. B, at 11, 36, 61, 92). C.Z. says he "even contemplated suicide" but clings to life because of his caretaking responsibilities for his aged mother. He continues, "I don't know how to live the days to come. Every single day is extremely difficult for me." (Exh. B, at 7). Y.C., who invested RMB 1,206,000, the equivalent of $180,539, describes "wak[ing] up alone in the deep of night, crying quietly and suffering gravely." (Exh. B, at 61).

Many victims experienced a combination of psychological and physical ailments. Victim D.F. explains how the fallout from defendant's crime as "a dark cloud hanging over the family, especially the physical and mental health of the three children have been seriously affected," and attributes recently diagnosed "gastrointestinal disturbances, thyroid nodules, liver cysts, and kidney stones" to the fraud. (Exh. B, at 87). D.H. similarly describes the persistent "mental suffering" defendant's crime inflicted and his hope to "return to normal life" after seeing his personal relationships with his colleagues and family members crumble. (Exh. B, at 10-11). He also attributes to defendant "irreversible" damage to his physical health, including the need for a cardiac pacemaker. (Exh. B, at 11). C.L. writes that, "due to mental and psychological pressure, we have suffered from high blood

pressure (we are seniors of at least 60 years old), quarreled with family members, and blamed each other over the years, which terribly affected familial harmony and happiness." (Exh. B, at 4). L.M., who lost a house to defendant's fraud, states, "My physical and mental conditions have been very terrible, and I need to rely on multiple types of medicines just to be able to maintain my daily life." (Exh. B, 36-37). Because of defendant's fraud, C.S.'s wife "was so worried that she was diagnosed with trigeminal neuralgia in March 2018. We don't have money for her to be treated in a general hospital. She relies on anesthetics every day. And the doctor and my friends all believe that Ruixue Shi is the root cause." (Exh. B, at 79).

What did all this human misery pay for? Defendant's frivolity. To name just a few of the examples, she spent $300,000 on two luxury cars; another $2.2 million at a luxury travel and concierge services company; nearly $800,000 at a "full-service styling agency" in Beverly Hills; and hundreds of thousands of dollars on high-end clothing designers, restaurants, and other stores.

**B.    The Calculated Nature of Defendant's Scheme Further Demonstrates Her Danger to Society and the Need for a Substantial Term of Imprisonment**

Defendant not only targeted individuals who could least afford to fall victim to her scheme; she intentionally preyed on their vulnerability. Though most her investors were Chinese nationals, she presented documents in English for them to sign, despite the fact that many did not understand the language. (PSR ¶ 18, at 7). Victim M.L. even says she told defendant she "couldn't understand them" (Exh. B, at 91), but to no avail. In fact, M.L. reports -- consistent with the experience of other victims -- that she had trouble finding defendant at her Beijing office and eventually came

14

to find it completely empty.  (Id.).  M.L. is not unique in
describing defendant as "simply inhuman" and "the most heinous
fraudster" and asking that the Court impose a "heavy sentence."
(Id.).

Defendant also exploited her victims' respect for the United
States and its institutions.  Many of defendant's victims relied, for
example, on her false promises that their investments would provide
them a key to immigrating to the United States through the EB-5 visa
program.  (E.g., Exh. B, at 4, 31, 32, 40).  This concern was
especially prominent among those victims who hoped to send their
children to the United States to further their education in search of
better lives.  (Exh. B, at 32, 40, 76).  Several also cited their
faith in the U.S.'s laws and business environment as a reason for
their trust in defendant's scheme.  (E.g., Exh. B, at 7, 84, 87).

Along with providing further evidence of her callousness,
defendant's penchant for turning her victims' hopes against them
demonstrates the sophistication of her scheme and the ongoing danger
she poses.  The Court should accordingly sentence her to 188 months'
imprisonment.

**C.  Both Defendant's Fraud Scheme and Her Conduct on Bond Show
the Need for a 188-Month Sentence to Promote Respect for
the Law and Afford Adequate Deterrence**

The egregiousness of defendant's scheme, both in terms of the
destruction she wrought and how she misspent her victims' savings,
demonstrate the need for a sentence sufficient "to promote respect
for the law."  18 U.S.C. § 3553(a)(2)(A).  But so too does
defendant's post-arrest conduct.  By defying her bond conditions and
researching how to successfully flee the country, defendant exhibited
disdain for the law and a lack of remorse for the damage she has done

15

1   to her victims.  But for the careful work of defendant's pretrial

2   officer, she could very well have departed the United States,

3   avoiding punishment and her restitution obligations to her victims.

4       This case also affords a unique opportunity to promote respect

5   for the law in another respect.  18 U.S.C. § 3553(a)(2)(A).  Many of

6   the investors, themselves Chinese nationals, explicitly stated that

7   they trusted not only in the strength of the American economy but in

8   the integrity of its legal system.  That trust must not be misplaced.

9       The immense profits defendant reaped from her fraud scheme, as

10  well as her willingness to commit new crimes to avoid responsibility,

11  also demonstrate the acute need for defendant's sentence to afford

12  deterrence, both general and specific.  Defendant has demonstrated

13  that her crime was not a one-off aberration but rather a window into

14  her selfishness, and there is no reason to believe she will not

15  offend again if the sentence in this case is insufficient to deter

16  her.

17  **V.   RESTITUTION**

18      As set forth in Exhibit A and the declaration of FBI Forensic

19  Accountant Travis Bouchard, an analysis of defendant's U.S. bank

20  records reveals actual losses to investors of $22,833,441.  A

21  breakdown of the amounts by victim is provided in Exhibit A under

22  seal to protect the privacy interests of the victims.

23      Additionally, the declaration of Mei Xuan summarizes the

24  documents provided in Exhibit C.  Those records indicate investor

25  losses of $3,352,193 (once investments in Chinese Yuan are converted

26  to U.S. dollars).  Together with the losses traced by Forensic

27  Accountant Bouchard, the total documented restitution figure is

28  **$26,185,634.**

The $26,185,634 figure, while readily quantifiable, frankly understates the actual losses defendant's victims suffered.  As explained in the declaration of Mei Xuan and Exhibit D, various victims have self-reported additional losses not captured in formal financial records.

The Mandatory Victims Restitution Act requires imposition of a restitution order for defendant's offense, <u>see</u> 18 U.S.C. § 3663A, and defendant agreed as part of her plea agreement to make restitution, though reserved the right to contest the precise amount.  (Plea Agreement ¶¶ 2(i), 6, at 2, 6).

**VI.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court impose a sentence of 188 months' imprisonment followed by three years of supervised release, restitution of $26,185,634, and a $100 special assessment.